CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 24 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DAVID ERROL WERT,<br>    Plaintiff,<br>v.<br><br>JEFFERDS CORPORATION,<br>d/b/a HOMESTEAD MATERIAL<br>HANDLING COMPANY,<br>    Defendant. | Civil Action No. 7:07CV00053<br><br><br><br>MEMORANDUM OPINION<br><br>By: Samuel G. Wilson<br>United States District Judge |

Plaintiff David Errol Wert ("Wert") brought this lawsuit arising from his physical injury in a forklift accident at his workplace, Yokohama Tire Company, on February 26, 2005. The case is now before the court on defendant Jefferds Corporation's ("Jefferds") motion for summary judgment. Wert sued Jefferds, an entity that sells, leases and maintains (but does not design or build) forklifts, and that employed a mechanic who repaired and maintained the leased forklifts at Yokohama's facility. The crux of all of Wert's claims is that if the forklift's reverse alarm and strobe light had been working, Wert would have seen or heard the forklift, and he never would have been injured. The Yokohama workers routinely destroyed these safety features, and Wert faults Jefferds for not doing more that it did to prevent the destruction from recurring. Wert brought the case in this court pursuant to its diversity jurisdiction, 28 U.S.C. § 1332, and because the injury occurred in Virginia, Virginia law controls. Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993).

Wert brings four claims: (1) "product liability negligent design" for Jefferds' failure to correct a design feature that allegedly made the forklifts' reverse alarm and strobe lights too easy to disable; (2) breach of an implied warranty of merchantability; (3) common law negligence for Jefferds' maintenance or repair of the forklift that allegedly caused the forklift to be without

certain safety features at the time of the accident; and (4) breach of an express warranty that the forklift was safe. The court finds that there is no genuine issue of material fact as to the causation of the accident, and as to several other issues that are critical to Wert's claims. The court therefore grants Jefferds' motion for summary judgment.

## I

In February 2005, Wert worked as a "tire finisher" at Yokohama Tire Company in Salem, Virginia. On February 26, Wert arrived at work at noon for a regularly scheduled 12-hour shift. At about 5:15 p.m. that day, Wert walked under a conveyor belt on his way to a machine called a "balancer" that was malfunctioning and required his attention. When Wert stepped away from the conveyor belt his foot was run over by a Clark ECG 20 model forklift, which was running in reverse at the time.

The "reverse alarm," which beeps loudly when a forklift is in reverse, was not functioning on the forklift that injured Wert. Nor was the strobe light, which flashes constantly whenever the forklift is turned on. (Spence Dep. 38). Wert would have seen the light or heard the alarm if they had been working, and he would not have been injured.

Jefferds leased forklifts manufactured by Clark to Yokohama. Those forklifts come to Jefferds fully assembled, including the reverse alarms and strobe lights. Jefferds employed a mechanic, Thomas E. Spence, who worked almost exclusively on the maintenance and repair of the forklifts at the Yokohama facility. There were a total of about 60 forklifts at Yokohama. (Spence Dep. 37). Spence was a permanent staff member of Jefferds, although his physical place of work was at Yokohama. Spence's duties were pursuant to the lease/maintenance contract between Yokohama and Jefferds.

Spence was responsible for carrying out regular maintenance on the forklifts on a 30-, 60- or 90-day rotation, depending upon how frequently a particular forklift was used. The maintenance included checking to ensure the reverse alarm and strobe lights were functioning. The strobe lights and reverse alarm were functioning on Feb. 18, 2005 – eight days before the accident – when Spence inspected and serviced the forklift that injured Wert.

The workers at Yokohama routinely destroyed the reverse alarms and strobe lights on the forklifts. They did not like the noise of the alarm nor the flashing light. The workers would disable the safety features in several ways. They would pull apart the wires that supplied power to the alarm, they would cut those wires with a knife or other tool, manually disconnect the wires, or they would use a tool to smash the safety feature itself, either the alarm box or the strobe bulb. (Spence Dep. 40). In 2005, all the forklifts were equipped with reverse alarms and strobe lights; both were optional features requested by Yokohama. Wert, who has worked at Yokohama for 12 years, was aware that about half of the forklifts' safety features had been destroyed. (Wert's Answers to Interrogatories No. 21). His habit was to check visually for oncoming forklifts.

Spence repaired the wires and other features that Yokohama workers had destroyed. He repaired them as he was notified by Yokohama of the repair needs. Yokohama was billed separately for these repairs, as they were due to abuse by Yokohama. These repairs were often done on a more frequent basis than the scheduled preventive maintenance. There is no evidence that Spence did not make these repairs promptly and effectively upon notification by Yokohama. When a wire was cut or pulled apart, Spence almost always reconnected the wires with a "butt connector." Other parts of the factory-installed wiring included a "quick disconnect" in which a male connection fit into a female connection. Wires could be easily pulled apart by hand at the

"quick disconnect," and the "quick disconnect" was a feature on the forklifts as they came from the factory. (Spence Dep. 78). However, it is unclear whether the forklift that injured Wert also had a "quick disconnect" that was added as part of a subsequent repair by Spence. (Dolinger Aff. ¶ 8-9); (Expert Report, Dr. John Casali 8). Spence was never notified nor was he aware of any problem with the forklift from the time he serviced it on February 18, 2005 until he heard about the accident some weeks later. (Spence. Dep. 30). Wert does not assert that Spence disabled the alarm or light himself, nor that the February 18 report is falsified or inaccurate.

There are other methods of reconnecting wires, and such methods create a connection that is more difficult to destroy without tools than a butt connection.

## II

An award of summary judgment may be made only "if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are viewed in the light most favorable to the non-moving party. See Lee v. York County Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007). To withstand a summary judgment motion, the non-moving party must offer evidence from which a fair-minded jury could return a verdict for the party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). This standard is applicable to each of the four claims at issue here.

## III

Wert brings one count of product liability negligent design based upon the theory that Virginia recognizes a seller's liability for "defects arising as a result of the installation of products that are shown to be defective in operation." (Plaintiff's Memorandum Opposing

4

Summary Judgment ("Pl.'s Memo.") 6). See H.M. Gleason and Co., Inc. v. Int'l Harvester Company, 197 Va. 255, 88 S.E.2d 904 (1955). Wert asserts that Jefferds added "new features" to the forklift, and that Jefferds therefore had a duty to adopt the safest feasible design. The court finds there is no genuine issue as to whether Jefferds added new features, to whether Jefferds' repair work was defective, or to whether any changes by Jefferds actually caused Wert's injuries. The court therefore grants Jefferds' motion for summary judgment.

To prevail in a products liability case of negligent design under Virginia law, "the plaintiff must prove that the product [1] contained a defect [2] which rendered it unreasonably dangerous for ordinary or foreseeable use. In addition the plaintiff must establish that [3] the defect existed when it left the defendant's hands and that [4] the defect actually caused the plaintiff's injury." Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993) (applying Virginia law) (numerals added); Redman v. John D. Brush and Co., 111 F.3d 1174 (4th Cir. 1997) (applying Virginia law). Virginia law does not require manufacturers to adopt the safest conceivable design. Redman, 111 F.3d at 1177-78. Products must meet prevailing safety standards at the time of production. In determining whether a product's design meets those standards, a court should consider whether the product fails to satisfy applicable industry standards, applicable government standards, or reasonable consumer expectations. Id.

Under Virginia law, the "standard of safety of goods imposed on the seller or manufacturer of a product is essentially the same whether the theory of liability is labelled warranty or negligence or strict tort liability: the product must not be unreasonably dangerous at the time that it leaves the defendant's possession if employed in the manner in which it was intended to be used or put to a special use known beforehand by the defendant." Chestnut v.

5

Ford Motor Co., 445 F.2d 967, 968 (4th Cir. 1971) (applying Virginia law) (emphasis added). Lessors such as Jefferds are subject to this standard because they "otherwise distribute" goods even though they do not sell them.[1] Restatement (Third) of Torts: Product Liability § 20 (2007). Therefore, the analysis of Wert's product liability negligence and implied warranty claims is the same.[2]

As to whether the forklift contained a defect, Wert attempts to show that Jefferds "designed" a defective product by installing "new features" "that allowed for safety devices to be manually disconnected." (Pl.'s Memo. 7). This argument fails. The evidence does not show that Jefferds added any "new features." Instead, the deposition of Spence shows that the standard method of repair was to use "butt connectors." The butt connectors were a repair device that put two ends of broken or cut wire back together. They could only be "manually disconnected" in the same sense that the original wiring could be "manually disconnected" – they could be torn apart. Wert's attempt to make a "butt connection" into a design feature is not supported by the

---

[1] According to the restatement, "one otherwise distributes a product when, in a commercial transaction other than a sale, one provides the product to another either for use or consumption or as a preliminary step leading to ultimate use or consumption. Commercial nonsale product distributors include, but are not limited to, lessors, bailors, and those who provide products to others as a means of promoting either the use or consumption of such products or some other commercial activity." Restatement (Third) of Torts: Product Liability § 20 (2007). This is not altered by the fact that services are also rendered. Id.

[2] One distinction is that no implied warranty of merchantability arises where the purchaser is a skilled purchaser "who has full knowledge of a defect or dangerous condition of a product . . ." Goodbar v. Whitehead Bros., 591 F. Supp. 552, 567 (W.D. Va. 1984). Jefferds makes the assertion that Yokohama is a skilled purchaser of forklifts, but does makes no showing that Yokohama "has full knowledge" of the defect alleged here – the wiring connections used by Jefferds during repair. Accordingly, the court finds the "skilled purchaser" doctrine does not bar the implied warranty of merchantability.

6

evidence submitted.[3]

As to whether the alleged defect rendered the product unreasonably dangerous, Wert has not presented sufficient evidence that the design "defect" – reconnected wiring – rendered the forklifts unreasonably dangerous for ordinary or foreseeable use. Far from rendering the forklifts unreasonably dangerous, the action by Jefferds obviously rendered the forklifts safer by fully restoring the function of the reverse alarm and the strobe light. That a product is subject to intentional destruction does not make it unreasonably dangerous. See, e.g., DeRosa v. Remington Arms Co., Inc., 509 F. Supp. 762, 769 (E.D.N.Y. 1981).

Regarding the third element of the claim, Wert has presented insufficient evidence that the defect existed when it left defendant's hands. There is very little, if any, evidence on the record showing that the allegedly defective repair work – Jefferds' use of butt connections – was present on the forklift involved in the accident. The only evidence of the state of the forklifts' safety features at the time it left Jefferds' control shows that the backup alarm and strobe light were fully operational. It is not enough to show that when a forklift needed repair, Jefferds did the repair work. Although the Spence deposition involves discussion of a photograph of a forklift with wires disconnected, it is not clear whether Jefferds had ever repaired that forklift's reverse alarm wiring, with a "butt connection" or otherwise. (Spence Dep. 72). Wert must offer some evidence that the alleged defect was present on the particular machine involved in the

---

[3] Wert also argues Jefferds, wholly apart from its contract with Yokohama, had a duty to unilaterally alter the design of a product that it did not manufacture or design, that was safe when manufactured, fully operational after Jefferds' repairs, and that met all of the buyer's specifications. There is no such duty. See, e.g., Butler v. Navistar Int'l Transp. Co., 809 F. Supp. 1202, 1209-10 (W.D. Va. 1991).

7

accident when it left the defendant's hands.

Finally, the critical missing link for Wert is causation. Spence's deposition shows that there were at least four methods of destroying the backup alarms – manual disconnection (as at a factory-installed quick disconnect), pulling apart (destruction without a tool), cutting (destruction with a tool), and smashing of the alarm itself with a wrench or hammer. (Spence Dep. 40). Therefore, use of a different connection method by Spence would only affect one of these four methods. Soldering and heat shrink wrapping – an alternative wire repair method suggested by Wert – would apparently do nothing to prevent someone from cutting the wire with a knife, smashing the alarm box with a hammer, or even pulling the wires apart at a different point on the wire. Jefferds has offered evidence that a "butt connection" is just as strong as the wiring from the manufacturer. (Roy E. Bolton Affidavit ¶ 5). Wert has offered no evidence to the contrary. That the Jefferds-installed connection could be pulled apart does not establish that is was less effective than the factory wiring, which could also be pulled apart. (Spence Dep. 40). Moreover, no "butt connector" would ever be needed if the wires weren't susceptible to intentional destruction in first place. Thus, the "butt connector" could not be deemed the cause of a problem (a broken alarm) that in <u>every instance</u> first occurred <u>without</u> a "butt connector." The wires could be intentionally destroyed at the moment they came off the assembly line. After Jefferds repaired the wires, they could still be intentionally destroyed. Given the evidence presented, no fair-minded jury could return a verdict in favor of Wert on the issue of causation.

Therefore, since the depositions and other materials show there is no genuine issue of material fact as to the required elements of the negligent design/implied warranty claims, Jefferds' motion for summary judgment will be granted.

8

# IV

Wert brings a negligence claim as a free-standing tort, separate from the negligent design claim and not based on Jefferds' failure to perform contractual duties. (Pl.'s Memo. 4). This claim is rooted in what Wert claims was Jefferds' common law duty to make reasonable inspection of vehicles furnished for the use of others. The court finds that Jefferds does not owe Wert a duty apart from Jefferds' contractual duties to Yokohama and the duties addressed above in the negligent design/implied warranty claim, and that no genuine issue exists as to whether reasonable inspection was performed. Therefore, insofar as Wert's claim reaches beyond the negligent design claim, the court grants Jefferds' motion for summary judgment on the common law negligence claim.

Under Virginia law, "[i]n determining whether an action sounds in contract or tort, the source of the duty violated must be ascertained." Richmond Metro. Auth. v. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 347 (Va. 1998). A party can in some circumstances show both a breach of contract and a tortious breach of duty. Id. A duty is contractual if a contract must be shown to demonstrate the duty that was violated. Id.

In this case, Jefferds' only relation to Wert was as a contracting party with Wert's employer, Yokohama. Responsibilities between Yokohama and Jefferds could only by shown by the contract as to forklift repair and maintenance. For example, the lease agreement requires Yokohama to make "a routine check of each unit of equipment at the beginning of each shift," a duty that Wert apparently wants Jefferds to shoulder. (Defendant's Exhibit B re: Motion Hearing 2). This agreement shows that forklift responsibilities between Yokohama and Jefferds could not

9

be determined without reference to the lease and maintenance agreement between them. Any violation of Jefferds' duty as to the forklifts would have to be established through Jefferds' contract with Yokohama. Therefore, Wert cannot establish that Jefferds committed a tortious breach of duty apart from Jefferds' contract with Yokohama.[4]

To the extent that Wert's negligence claim raises any issues not considered in the negligent design and implied warranty analysis, the claim fails because there is no genuine issue as to whether Jefferds tortiously breached a common law duty to Wert. Jefferds' motion for summary judgment will therefore be granted.

V

Wert also asserts that Jefferds breached an express warranty. Wert argues that Jefferds' method of repairing broken wires constitutes a breach of the express warranty of safety and of the warranty to lease, maintain, and repair forklifts with reverse alarms and strobe lights. Because there is no genuine issue as to the existence of a warranty of safety, and no genuine issue as to breach of the other warranties, Jefferds' motion will be granted.

Under Virginia law, express warranties by a lessor are created by (1) any affirmation of fact or promise by the seller which relates to the goods and becomes a basis of the bargain,[5] (2)

---

[4] Even if Wert could establish such a duty, the claim would fail because there is no genuine issue as to whether Jefferds failed to fulfill the duty to make a reasonable inspection that Wert relies upon. Smith v. Mooers, 142 S.E.2d 473, 475 (Va. 1965). Indeed, the depositions and other materials show that Spence made a full inspection of the forklift eight days before the accident and ensured that the reverse alarm and strobe light were in working order. (Spence Dep. at 57-58).

[5] The warranty created is that the goods will conform to the affirmation or promise.

10

any description of the goods which is made part of the basis of the bargain, and (3) any sample or model which is made part of the basis of the bargain. Va. Code Ann. § 8.2A-210 (2007). Thus, an express warranty is any affirmation concerning the character, quality, or condition of goods, having effect of inducing a sale, if the buyer purchases the goods relying on the affirmation. Carney v. Sears, Roebuck & Co., 309 F.2d 300, 303 (4th Cir. 1962) (applying Virginia law).

Wert asserts in his second amended complaint that Jefferds' made an express warranty of the forklifts' safety. However, no evidence of such a warranty has been submitted to the court and no such warranty is mentioned in Plaintiff's Memorandum. Jefferds' vice president, Kim Anderson, has sworn that no such safety warranty was made. (Jefferds' Aff. ¶ 7). There is thus no evidence from which a reasonable jury could conclude that an express warranty of safety existed.

In the absence of an express warranty of safety, Wert is left with an express warranty to lease, maintain and repair forklifts. That Jefferds contracted to lease and maintain forklifts for Yokohama is not in dispute. However, there has been no evidence to suggest that such a warranty was a part of the basis of the bargain at issue, though this is a legally required element in every instance of an express warranty claim. Va. Code Ann. § 8.2A-210 (2007). Assuming arguendo that such a promise was part of the basis of the bargain, all of the materials in the record tend to show that Jefferds has fully fulfilled the promise. There is no evidence from which a reasonable jury could conclude that Jefferds did not lease, maintain and repair forklifts in accordance with its express warranty to do so. No fair-minded jury could conclude that Jefferds' use of a common wire-connecting device was a breach of Jefferds' promise to maintain and repair the forklifts. Obviously, the action was instead the fulfillment of that promise.

11

Therefore, Jefferds' motion for summary judgment as to this count will be granted.

IV

For the reasons stated, the court grants defendant Jefferds motion for summary judgment.

**ENTER**: This 24th day of January, 2008.

_____
UNITED STATES DISTRICT JUDGE